UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| PATRICIA KEECH, and DAVID NEWFIELD, on behalf of themselves, and all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>SANIMAX USA, LLC<br><br>Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)   Case No. 18-cv-00683-JRT-HB |

## DEFENDANT SANIMAX USA, LLC'S BRIEF IN SUPPORT OF CLASS ACTION SETTLEMENT AGREEMENT

Subject to its position on class certification as set forth in its briefing on its Motion to Strike Class Allegations (Doc 20), Defendant Sanimax USA, LLC ("Sanimax") respectfully submits this brief in support of the final approval of the proposed class action Settlement Agreement. Following the Class Notice, the proposed settlement has been overwhelmingly well received by the putative Settlement Class Members. Of the thousands of putative Class Members, there are only three objections, only seven opt-outs (some of whom have expressed support for Sanimax's position), and over 1,500 Claim Form submissions seeking a distribution from the proposed Settlement Fund. Following a thorough examination of the claims, the law, and the facts, the proposed settlement is more than a fair, reasonable, and adequate resolution to this litigation and should be approved.

# TABLE OF CONTENTS

FACTUAL AND PROCEDURAL BACKGROUND ....................................................... 1

I.       Defendant, the Facility, and the Surrounding Area ........................................ 1

II.      Plaintiffs' Lawsuit and Defendant's Conduct ................................................. 4

III.     The Proposed Settlement ................................................................................. 6

IV.      Reactions from the Community ....................................................................... 8

ARGUMENT ............................................................................................................. 10

I.       Final Approval Standard ............................................................................... 10

II.      Without a Settlement, the Putative Class Likely Would Not Be Certified and this
         Litigation Likely Would Result in No Recovery for the Putative Settlement Class ........ 11

III.     Without a Settlement, Plaintiffs May Well Recover Nothing Because Their Claims Are
         Questionable and Extremely Difficult, If Not Impossible, to Prove ................................ 13

         A.      Common Law and Statutory Nuisance Claims .................................... 13

         B.      Negligence & Gross Negligence Claims ............................................. 17

         C.      Defenses to Plaintiffs' Claims ........................................................... 18

IV.      The Less Than a Handful of Objections Have No Merit ................................. 21

         A.      Newport ............................................................................................. 21

         B.      Lund .................................................................................................. 27

         C.      Bern ................................................................................................... 31

CONCLUSION ......................................................................................................... 32

3506444.0002/159370245.1

**FACTUAL AND PROCEDURAL BACKGROUND**

## I. DEFENDANT, THE FACILITY, AND THE SURROUNDING AREA

Sanimax is a family-owned business that began three generations ago in the 1930's. As a rendering company, Sanimax reclaims, renews, and returns approximately four billion pounds of agri-food industry by-products, such as animal carcasses, meat by-products, used cooking oil and grease, hides, and other organic material. Sanimax transforms these materials, which are used by Sanimax's customers to produce numerous household products, including animal feed, pet food, soaps, leather, lubricants, paint, rubber, tires, shampoos, cosmetics, perfumes, cleansing creams, essential medicines, and more. This industry essentially recycles approximately four billion pounds of agri-food industry by-products that would otherwise literally fill up all of the nation's landfills in just a few years. Sanimax performs a vital function for society that serves the greater good.

The rendering facility at issue in South St. Paul (the "Facility") has been operating proudly since 1961. For more than a half century, it has been a valuable corporate citizen providing jobs and contributing millions of dollars to the tax base. The location of Sanimax's Facility is no accident. South St. Paul is a municipality that is over 130 years old with approximately 20,000 residents. Once known as a "cow town," South St. Paul was shaped by over a century of stockyards and meat packing plants.

The South St. Paul stockyards were the largest stockyards in the world for decades. More than 300 million head of cattle passed through its pens and alleys. Numerous other industries related to the animals, the waste products they generated, and their carcasses sprung up many decades ago. Documentaries were created about the area memorializing

1

its well-known and historically significant operations. Although the stockyards closed in 2008, those other businesses and facilities—tanning facilities, dog food plants, rendering operations, etc.—continue to operate to this day. *See* Figures 1 and 2.



**Figure 1.** South St. Paul circa 1960. Courtesy Minnesota Historical Society.



**Figure 2.** South St. Paul. Picture taken by Vic Ziolkowski, Dec. 12, 2012.
(https://c1.staticflickr.com/9/8499/8292374009_663dee28a9_b.jpg)

3506444.0002/159370245.1

Across the river from South St. Paul is the City of Newport. Newport is more than 150 years old, but currently has less than 4000 residents. For over a century, it too has been the home of various business, several of which benefitted by being so close to the stockyards. In the city's own words, Newport has a "long history as part of the industrial core of the Mississippi river corridor in the Twin Cities Metropolitan area. For many decades, South St. Paul, just across the river, was the center of livestock trade in the Upper Midwest, boasting the largest stockyard in the country outside of Chicago. Newport benefitted from its location, with much of its own job base coming from livestock and transportation-related industries, most notably Newport Cold Storage, which remains the City's largest single employer." Doc 72, Newport's Memorandum in Support of Motion to Intervene at 2.

Virtually all of the local residents are well-aware of the long and well-established odiferous history of the stockyard district and surrounding area. Numerous potentially pungent odor sources exist here. For example, within two miles of the Facility there are at least three meat and/or livestock processing facilities, multiple animal tanning operations, a crematorium, and the Ramsey/Washington County Recycling and Energy Center, which boasts of handling solid waste from 785,000 residents and 407,000 people employed in two counties. Multiple other potentially pungent odor sources are also nearby, including a municipal compost site, the Northern Tier Refinery, the Met Council L-65 Pump Station, and the Metropolitan Wastewater Treatment Plant, which is one of the largest wastewater plants in the nation, averaging 215 million gallons of wastewater or raw sewage every day from 62 communities and more than two million residents. *See* Doc. 75, Sanimax Response

and Memorandum in Support of Motion to Intervene ("Sanimax Intervention Response") at 2-3 nn.1-2.

There are literally over a dozen other significant odor sources existing in and around the historical stockyard district. As Newport represented to the Court, the bridge between it and South St. Paul is still commonly known as the "stinky bridge." Doc 78-1 (Ex. 4), Newport 10/2/2019 letter at 1. The area was, and remains, an industrial animal-processing area where odor emissions from multiple sources have been a well-known and common occurrence for longer than most of its current residents have been alive.

## II.    PLAINTIFFS' LAWSUIT AND DEFENDANT'S CONDUCT

This case is a putative class action brought on behalf of certain residents who have chosen to live in the historical stockyards district. On March 12, 2018, Patricia Keech and David Newfield ("Plaintiffs") filed a putative class action against Sanimax claiming that its Facility emitted odors that rose to a nuisance level. Plaintiffs allege common law and statutory nuisance claims (Count I)[1] and negligence and gross negligence claims (Counts II & III). Plaintiffs seek injunctive and monetary relief. Doc 44, Plaintiffs' First Amended Class Action Complaint ("FAC").

---

[1] Plaintiffs' allegations include all common law nuisance claims they could assert, including claims for both private and public nuisance. The cited statute is typically associated with private nuisance claims. Minnesota law is arguably ambiguous whether individuals (as opposed to governmental bodies) can assert a claim under the public nuisance statute, but even cases that suggest individuals can assert claims under that statute recognize that the right to do so comes from common law and have held that plaintiffs do not need to cite the statute in the complaint to have asserted a public nuisance claim. *See, e.g., Doe 30 v. Diocese of New Ulm*, No. 62-CV-14-871, 2014 WL 10936509, *6, 8-11 (Minn. Dist. Ct. 2014).

3506444.0002/159370245.1

Plaintiffs seek to represent a putative class of others similarly situated defined as:

> All current and former owners or occupiers of residential property located within two mile radius of Defendant's facility at 505 Hardman Avenue, South St. Paul, Minnesota, and all owners or occupiers of residential property outside of that radius who submitted a residential data sheet to Class Counsel on or before July 15, 2019 concerning odors or emissions from South St. Paul.

Doc 85, Order Granting Motion for Preliminary Class Certification ("Preliminary Approval Order") at 3-4; *see also* Doc 63-1, Settlement Agreement at ¶2(c).

After being sued, Sanimax did not "dig in its heels" or delay taking action. In fact, Sanimax had already been working on odor abatement issues at the Facility in response to concerns previously raised by South St. Paul. Sanimax had been trying to work cooperatively with the city, continuing its long history of being a good neighbor and corporate citizen of the stockyard district. Sanimax has invested significantly in odor abatement equipment, including installing a new ozone generation system, an odor misting system, and significant upgrades to its odor abatement equipment. Since 2011, Sanimax has invested over $2.5 million on odor-related issues.

Sanimax's efforts and investments have had a significant positive impact. South St. Paul had previously designated the Facility as a significant odor generator; however, on April 27, 2017, South St. Paul withdrew and rescinded that designation. While the critical rendering function the Sanimax Facility has been performing for almost six decades cannot be accomplished in an odor-free environment, Sanimax continues to focus on its emissions and endeavors to mitigate them.

3506444.0002/159370245.1

## III.   THE PROPOSED SETTLEMENT

The Court's Order Setting Pretrial Conference (Doc 41) mandated that Plaintiffs make an initial demand by January 22, 2019. The parties then engaged in arm's length settlement discussions. Eventually, they agreed to meet in Indianapolis to mediate this case with an experienced mediator. After an almost 12-hour mediation, the parties came to an agreement in principal but with several details left to negotiate. The parties continued their arm's length and, at times, contentious negotiations until finally executing a proposed settlement agreement on August 6, 2019. Doc 63-1, Settlement Agreement.

Among other things, the proposed Settlement Agreement would require Sanimax to deposit $750,000 into a Qualified Settlement Fund account and invest at least $450,000 in improvement measures designed to reduce emissions of pollutants, contaminants, and odors from the Facility. In exchange for this $1.2 million worth of consideration, the Settlement Class would release claims and covenant not to sue, and this case would be dismissed with prejudice. Doc 63-1, Settlement Agreement at ¶¶ 5(a), 6(a), 7(a)-(b).

In terms of the $750,000 Settlement Fund, Sanimax's sole responsibility is to fund the account. Class Counsel is responsible for Administration of Settlement, including making distributions from the Settlement Fund, as the Court shall approve after consideration of Class Counsel's request for attorneys' fees, incentive awards for Named Plaintiffs, reimbursements for Administration of Settlement, and plan of allocation. *See id.* at ¶¶ 2(a), 3(d)-(f), 5(b)-(f). If there are funds remaining in the Settlement Fund following its distribution to the Settlement Class (which is not anticipated), then such funds will be spent on one or more community projects in South St. Paul. *Id.* at ¶ 5(g).

3506444.0002/159370245.1

In terms of the $450,000 investment in improvement measures, Sanimax anticipates completing multiple projects, the largest of which likely will be either replacing a venturi scrubber or adding a new scrubber to the feathers processing plant at the Facility. This project is anticipated to have a significant odor abatement impact because the feathers processing plant likely accounts for odors that could be emitted from the Sanimax Facility. Installation of either a replacement venturi scrubber with enhanced technology and capabilities or the addition of a new second scrubber, would allow Sanimax to perform the two-stage chemical treatment process to mitigate odor emissions.

Based on experience, installation of either a replacement venturi scrubber or a new scrubber at the Facility realistically will take years from approval through commencement of normal operations. Regulatory and permitting hurdles in Minnesota will significantly add to the timetable. Some of the basic sequential steps include: baseline air modeling designed to demonstrate the current conditions for air permits (estimated to take four months); engineering analysis and design (estimated to take five months); post-project air modeling to demonstrate the anticipated conditions after project completion for the air permits (estimated to take eight months); city building permit approval process (estimated to take six months); air permit approval process (estimated to take twelve months); construction and installation (estimated to take ten months); and operational testing (estimated to take six months). The timetable, therefore, currently stands at 51 months or four years and three months. While there may be some overlap, most of these phases will need to be completed before the next one can really begin.

3506444.0002/159370245.1

Even aside from issues like the current COVID-19 pandemic, this timetable necessarily relies on events and third-parties that are outside of Sanimax's control. Moreover, the engineering, studies and analysis have not yet been completed to determine whether a replacement venturi scrubber or an additional scrubber should be installed. Consequently, the Settlement Agreement affords the parties needed flexibility both in terms of the timetable and in terms of the specific equipment or projects that are undertaken. However, the Settlement Agreement does (1) require a specific minimum amount to be invested, $450,000, (2) require Sanimax to annually report to Class Counsel, and (3) cap the Implementation Period at no more than four years. Doc 63-1, Settlement Agreement at ¶¶ 2(m), 6(a)-(c).

## IV. REACTIONS FROM THE COMMUNITY

This Court preliminarily approved the proposed Settlement Agreement (over an objection and requested intervention by the City of Newport) and approved the manner and substance of the notice to be provided to the putative Settlement Class Members. Doc. 85, Preliminary Approval Order. As required by that order and the proposed Settlement Agreement, Defense counsel sent notice consistent with 28 U.S.C. § 1715 to the federal, state, and local governmental agencies with any possible regulatory authority over the Facility, and Class Counsel established the website and mailed the Class Notice to the putative Settlement Class Members.

In response to the Class Notice, over 1500 putative Settlement Class Members submitted Claim Forms seeking a distribution from the Settlement Fund. There were only three objections, all from Newport or those apparently affiliated with Newport. And there

3506444.0002/159370245.1

were only seven opt outs, some of whom opted out because they were opposed to any action against Sanimax. In addition, a couple putative Class Members (including at least one Newport resident) contacted Sanimax and expressed several supporting sentiments, including:

- For as long as they could remember, dating back to before the 1950s, South St. Paul and Newport have had odors from various industries. These odors have been and still are something you expected if you live in South St. Paul or Newport, given the agricultural nature of these businesses.

- When odors are present, they could not differentiate between different odors or different odor sources, and they suggested Sanimax was being unfairly blamed for odors from various other sources.

- Residents of Newport and South St. Paul, have expected and tolerated odors because they understand that these industries are part of the fabric of their community and that they bring significant benefits to the community. Businesses like Sanimax provide good jobs, a strong tax base, and lower residential property taxes. On balance, these benefits substantially outweigh the occasional odor that they experience in their communities.

- Without the presence of these industries over time, their communities might not even exist. When the stock yards closed down, it had a devastating effect on the local economy. If the remaining industries in this area that had originally served the stock yards were to close as well, there is no question that their communities would be harmed.

- They are proud residents of their communities and strong supporters of Sanimax and the other industries in their communities.

Other putative Class members have contacted Class Counsel and, among other things, thanked them for their efforts and commented that odors in general are much better now than they used to be. One of the opt-outs perhaps put it best, when she added the following to her request to be excluded:

> Additionally, we have lived here 17 months and have "smelled" a little bit of something one time. We both have no interest in taking advantage of this business [Sanimax] in this matter. We appreciate the fact that this area was of historical significance in regards to agriculture. I grew up on a farm and my husband[']s uncle had a pig farm with 300 head. Wouldn't bother us if we did smell it!

Moen & Klinger Opt Out at 1. In short, there is significant community support for Sanimax, including from those who have opted out of the proposed Settlement Agreement.

## ARGUMENT

### I.   FINAL APPROVAL STANDARD

"The single most important factor in determining whether a settlement is fair, reasonable, and adequate is a balancing of the strength of the plaintiff's case against the terms of the settlement." *Marshall v. NFL*, 787 F.3d 502, 508 (8th Cir. 2015). Class Counsel has already set forth the standard for this Court's consideration of the proposed settlement under Rule 23 and the Court of Appeals of the Eighth Circuit. *See* Fed. R. Civ. P. 23(e)(2); *Marshall*, 787 F.3d at 508 (listing the *Van Horn* factors used in this circuit). Plaintiffs' submissions and the background of this case as set forth above aptly demonstrates that several of the factors for approval have been satisfied. Instead of repeating them (as none of them appear to be in question), Sanimax will focus on "[t]he single most important factor." *See Marshall*, 787 F.3d at 508.

The proposed Settlement Agreement speaks for itself, contains much more detail, and is incorporated herein by reference. As set forth in the Settlement Agreement, Sanimax's position is that, "despite committing no wrongdoing, having valid defenses for the operation of the Facility, and maintaining that no class should or could be certified

under the governing law, the aggregate consideration to the Settlement Class is more than fair, reasonable, and adequate resolution of the claims at issue." Doc 63-1, Settlement Agreement at ¶ 3(f). As shown below, weighed against the merits (or lack thereof) of the claims against Sanimax and the risks and delays of litigation the proposed Settlement Agreement should be approved.

## II. WITHOUT A SETTLEMENT, THE PUTATIVE CLASS LIKELY WOULD NOT BE CERTIFIED AND THIS LITIGATION LIKELY WOULD RESULT IN NO RECOVERY FOR THE PUTATIVE SETTLEMENT CLASS

As this Court has already found, "it seems unlikely that the Plaintiffs will be able to prove their nuisance claim on a class-wide basis…" *See* Doc 40, Memorandum Opinion and Order Denying Sanimax's Motion to Strike Class Allegations ("Order Denying Motion to Strike") at 5; *see also* Doc 82, Memorandum Opinion and Order Denying City of Newport's Motion to Intervention ("Order Denying Intervention") at 2. The odors in this case are transient. *See* Doc 44, FAC at ¶ 33 (alleging odors caused Plaintiffs to suffer harm "on frequent occasions"). Odors are emitted into the air from a particular source at a particular time. The wind then carries the odor particles away from the source, and the strength of the odor will dissipate as it is mixed with other air particles.

Whether any single person notices the odor (much less whether such odor could rise to the level of a nuisance) depends on a number of factors—including, but not limited to, whether he or she is downwind of the odor source, how far downwind he or she is, whether he or she is directly downwind or off to one side or the other, the strength of the particular odor, the amount and velocity of the wind, the other weather and atmospheric conditions, and the sensitivity of his or her olfactory senses or sense of smell—all of which must be

11

considered at each particular point in time during the intermittent period when that particular odor exists. It is literally impossible for all putative class members to be equally affected by any single odor—undeniably, more than half of the class would necessarily be upwind of an odor at any given time and, thus, essentially not affected.

This case is unique because of the numerous already-identified sources of odors in the area. *Supra* at 3-4. While the chances of getting a putative class certified in cases like this are generally not strong, here Sanimax's arguments are particularly strong. *See* Doc 22, Memorandum In Support of Motion to Strike Class Allegations. The Court of Appeals for the Eighth Circuit has clarified that claims which rely on environmental causation factors that can vary from one putative class member to the next, do not satisfy the class certification requirements of Rule 23. *See, e.g.*, *Ebert v. Gen. Mills, Inc.*, 823 F.3d 472, 481 (8th Cir. 2016).

Moreover, under long-standing Minnesota Supreme Court precedent, it is impossible to prove a private nuisance on a classwide basis. In *Hill v. Stokely-Van Camp, Inc.*, 109 N.W.2d 749 (Minn. 1961), the plaintiff attempted to estop the defendant from arguing that its canning facility was not a nuisance on the basis that two prior lawsuits brought by plaintiff's neighbors against the defendant resulted in two judgements, each holding that the same emissions at issue from the facility were a nuisance. *Id.* at 750. The Minnesota Supreme Court disagreed, holding that Minnesota law requires each plaintiff to prove the elements of his or her own nuisance case: "The mere fact that it has been established that the operation of [a] factory constituted a nuisance as against someone else is not sufficient to establish that it also constituted a recoverable nuisance as against [any

other] plaintiff … [Instead,] it must be shown in each case that the operation of the thing claimed to be a nuisance is such a nuisance as to him…" *Id.* at 753-54.

Thus, under Minnesota law, a nuisance claim must be individually proven by each claimant because the determination of whether there was a nuisance requires an individual examination concerning the impact on the particular claimant—meaning that a judgment that certain emissions from a factory were a nuisance to one resident cannot, as a matter of law, collaterally estop the factory from claiming that those same emissions were not a nuisance to that resident's neighbor. *See id*. To the extent there is no settlement, and Sanimax affirmatively opposes certification, it is highly unlikely that any class would be certified in this case. Consequently, the Court must weigh as a significant risk here that after years of litigation to get this case through trial and all appeals, the only claims likely to be adjudicated and redressed would be the two Named Plaintiffs' individual claims and the putative Settlement Class would get nothing.

## III. WITHOUT A SETTLEMENT, PLAINTIFFS MAY WELL RECOVER NOTHING BECAUSE THEIR CLAIMS ARE QUESTIONABLE AND EXTREMELY DIFFICULT, IF NOT IMPOSSIBLE, TO PROVE

### A. Common Law and Statutory Nuisance Claims

Plaintiffs allege common law and statutory nuisance claims. *See* Doc 44, FAC at ¶¶ 23-37. A private nuisance claim in Minnesota requires the plaintiff to show (1) that a defendant "intentionally maintains a condition" (2) that is "injurious to health" or "indecent or offensive to the senses" or "obstructs free use of property…" *Wendinger v. Forst Farms, Inc.*, 662 N.W.2d 546, 551 (Minn. Ct. App. 2003). Further, (3) the interference to Plaintiffs' health, senses, or property must be "material and substantial." *Citizens for a Safe Grant v.*

*Lone Oak Sportsmen's Club, Inc.*, 624 N.W.2d 796, 803 (Minn. Ct. App. 2001). Further, "[a] nuisance may at the same time be public and private." *Hill*, 109 N.W.2d at 752-53 (citing *Aldrich v. Wetmore*, 53 N.W.1072, 1073 (Minn. 1893)). "The general rule, upon which there is no conflict, is that a private action may be maintained to redress an injury of this character [public nuisance] where the plaintiff has suffered some special or peculiar damage not common to the general public, and in such cases only." *North Star Legal Found. v. Honeywell Project*, 355 N.W.2d 186 (Minn. Ct. App. 1984) (quoting *Hill*, 109 N.W.2d at 753). The interference is judged "by the standards of ordinary people ***in relation to the area where they reside***." *Citizens for a Safe Grant*, 624 N.W.2d at 803 (emphasis added). If this case were litigated to judgment, Plaintiffs' private and public nuisance claims would fail for several reasons.

*First*, under Minnesota law, it is unlikely that any emissions from the Sanimax Facility were a nuisance even if they were odiferous. As this Court already has held, "[i]n Minnesota, 'the existence of a nuisance is determined on the basis not only of the defendant's activity, but also the gravity or materiality of its harmful effect on the plaintiff.' As such, a 'defendant's liability for nuisance is determined by balancing 'the social utility of defendants' actions with the harm to the plaintiff.'" Doc 40, Order Denying Motion to Strike at 6-7 (quoting *Schmidt v. Vill. of Mapleview*, 196 N.W.2d 626, 628 (Minn. 1972) and *Johnson v. Paynesville Farmers Union Co-op. Oil Co.*, 817 N.W.2d 693, 706 (Minn. 2012)).

In balancing these considerations and "deciding whether or not a particular act or omission is a nuisance, the court must keep in mind that a lawful business . . . should not

be destroyed or unreasonably hampered unless absolutely necessary to the public good." *Vill. of Wadena v. Folkestad*, 260 N.W. 221, 222 (Minn. 1935). In determining whether a nuisance exists, "consideration must be given to the neighborhood and to the usual disturbances prevalent thereabouts. One living in or near a business section of a city or town must necessarily submit to the incidental [interference] to be found wherever people gather to trade and to carry forward the usual commercial activities which are inseparably associated with the life of any city or town." *Id*.

In light of the substantial social utility provided by Sanimax's rendering operations at the Facility, coupled with its location in the historic stockyard district for almost six decades, it is unlikely that Plaintiffs can prove its emissions are a nuisance. *Supra* at 1-4, 9-10. As the one opt-out put it, "Wouldn't bother us if we did smell it!" *Supra* at 10.

*Second*, Plaintiffs are unlikely to prove that the level of interference due to any odor from the Sanimax Facility was both "material and substantial" in the context of residences within the historic stockyard district. Strong odors have existed in this area for well over a hundred years. Residential neighborhoods in the area are located near numerous other odor causing sources. Minnesota law recognizes that nuisance claims must be evaluated in the applicable context of the case; the mere existence of odors, even noxious or offensive, does **not** create a nuisance for which a party is entitled to compensation if those odors would be expected to occur in the context from which they came. *See, e.g.*, *Romer v. St. Paul City R. Co.*, 77 N.W. 825, 827 (Minn. 1899) ("The rights and convenience of property owners cannot alone be considered, for one living in a city must necessarily submit to the

annoyances which are incidental to urban life, and individual comfort must in many cases yield to the public good."); *Vill. of Wadena*, 260 N.W. at 222.

Today, and for the past hundred years, the stockyard district has been widely known to emit pungent odors from several sources. Sanimax's Facility has been part of that district for over half a century. Sanimax will be able to produce testimony from Plaintiffs' fellow community residents to validate the long-standing nature of odor from numerous sources in the area. *Supra* at 9-10. Sanimax in unaware how Plaintiffs could possibly establish that odors, even noxious ones, were not expected and, therefore, actionable.

*Third*, Plaintiffs have the burden of proving the odors emanated from the Sanimax Facility and caused them harm, which presents three significant challenges. One, for each alleged odor emission at a given time on a given day, Plaintiffs would need to prove that said odor traveled from the Facility to each Plaintiff's residence. For each alleged odor emission, this will require consideration of numerous factors—wind direction, speed and velocity, topography between the specific residence and the Facility, atmospheric pressure and conditions, content and strength of the particular order, etc.— to show that the particular odor emission could have traveled from the Sanimax's Facility to the individual residence. It will also require air modeling studies of wind patterns, which are extremely complex and can lead to different results based on relatively minor adjustments to the data inputs—making them suspect evidence for a judge or jury.

Two, nuisance claims have both an objective and a subjective element. Plaintiffs will need to prove that the transient odor was of such a strength and magnitude to the residence in question that it would have been a nuisance to an average person (the objective

16

element). Plaintiffs will also need to prove the odor actually was a nuisance to the individuals at the residence (the subjective element). Of course, as odors travel, they necessarily become diluted as they mix with several other particles in the air, making this proof objectively difficult. Further, Plaintiffs will need to prove that the individuals were actually home at the same time the odors were present and were affected by it. In addition, each person's sense of smell varies and the variations can be dramatic, so what may be offensive to some would not even be noticed by others. Typically, this causation component requires another set of olfactory experts, who may need to test the particular individuals' sense of smell. These issues present a whole other set of complicating proof issues for Plaintiffs' claims.

Last, there are already more than a dozen other odor sources identified in the record of this case, several with similar odor profiles. Sanimax cannot be held liable for any odors emitted from any of these sources, which collectively generate far more odors than Sanimax. Thus, for any single odor Plaintiffs could prove was present at a particular residence at a particular time on a particular day, chances are significant that said odor did not come from the Sanimax Facility and/or was mixed with odors from multiple other sources. It will be exceptionally difficult for Plaintiffs to prove what amount of any particular odor came from what source to any reasonable degree of certainly.

**B.      Negligence & Gross Negligence Claims**

Plaintiffs also alleged both negligence and gross negligence claims. Doc 44, FAC at ¶¶ 38-49. "Minnesota law defines negligence as 'the failure "to exercise such care as persons of ordinary prudence usually exercise under such circumstances.'" To prove

negligence, Plaintiffs must prove: '(1) the existence of a duty of care, (2) a breach of that duty, (3) an injury, and (4) that the breach of the duty of care was a proximate cause of the injury.'" Doc 40, Order Denying Motion to Strike at 9 (quoting *Domagala v. Rolland*, 805 N.W.2d 14, 22 (Minn. 2011) (quoting *Flom v. Flom*, 291 N.W.2d 914, 916 (Minn. 1980)). To satisfy the proximate causation element of a negligence claim, there must be a showing that the defendant's "conduct was a substantial factor in bringing about the injury." *Flom*, 291 N.W.2d at 917.

The same factors referenced above, if litigated, likely would defeat Plaintiffs' negligence claim. Aside from Plaintiffs' vague allegations, Plaintiffs have not identified a single negligent act by Sanimax. Sanimax is confident that it has operated at or above the industry standard of care and that any competent industry expert will agree. For all the reasons discussed above, it is unlikely that Plaintiffs will be able to prove causation between any alleged negligent act and any damage.

For a gross negligence claim in Minnesota, Plaintiffs must show that Sanimax's conduct was "substantially and appreciably higher in magnitude than ordinary negligence [and] materially more want of care than constitutes simple inadvertence [that] is an act or omission respecting legal duty of an aggravated character as distinguished from a mere failure to exercise ordinary care." *Ackerman v. American Family Mut. Ins. Co.*, 435 N.W.2d 835, 840 (Minn. Ct. App. 1989). There is no evidence to support such a claim in this case.

### C.     Defenses to Plaintiffs' Claims

Sanimax has pled a number of affirmative defenses, each of which could defeat Plaintiffs' claims. *See* Doc 45, Answer and Defenses at 7-11. Sanimax highlights only three

of them below for purposes of this Court's consideration of the merits of Plaintiffs' claims to determine whether the proposed Settlement Agreement is fair, reasonable, and adequate.

*First*, Plaintiffs' nuisance claims are at serious risk of dismissal as time-barred. Sanimax has been operating in this area since 1961, and Plaintiffs do not allege any recent change in Sanimax's operations or the odors generated by Sanimax. Plaintiffs have the burden of demonstrating that a unique cause of odors has occurred within the limitations period that did not occur during the prior 50-plus years in which the Facility was operating before the limitations period. *See, e.g., Town of Dish v. Atmos Energy Corp.*, 519 S.W.3d 605, 612-613 (Tex. 2017) (even though the level of nuisance allegedly increased sharply within the limitations period, city's nuisance claim concerning noise and pollutants from compressor stations was barred by the statute of limitations because the underlying cause existed before the limitations period). Sanimax is confident Plaintiffs cannot prove any such unique cause in this case.

*Second*, Sanimax has operated in compliance with both the industry standards for animal rendering operations and the applicable regulatory requirements during the limitations period. *See, e.g.*, *Jedneak*, 4 N.W.2d at 329 ("…ordinarily the fact that an industry is being operated under methods best calculated to remove the conditions causing the inconvenience is convincing indication that whatever annoyance is being suffered by those living there is only such as is inescapably present in that area."); *see also Effingham County Board of Commissioners v. Shuler Bros., Inc.*, 595 S.E.2d 526 (Ga. App. 2004) (operation of a mill was not a nuisance because "[t]hat which the law authorizes to be done, if done as the law authorizes, cannot be a nuisance"); *Bd. of Health of Wayne Tp. v.*

*Paterson Tallow Co.*, 65 A.2d 112, 114 (N.J. Super. Ct. Ch. Div.1948) (dismissing claims against defendant and noting that, although the plant's existence may be "undesirable from the neighbors' viewpoint," its operation was not a nuisance, especially considering the odor controlling equipment newly installed at the plant). This is not a case where Plaintiffs can hang their hat on a major regulatory violation or operational flaw. Sanimax has acted reasonably to mitigate odors that may have been generated.

*Third*, as referenced above, Sanimax will present evidence of multiple intervening causes and/or alternative causes of the odors. *Supra* at 3-4. Simply put, there are a multitude of other causes or sources of any one odor. Even if Sanimax generated odors that potentially reached the Plaintiffs' properties, if those odors were displaced or otherwise combined with or masked by another facility's odors, then Sanimax cannot be liable for any harm caused. *See, e.g.*, *Lennon v. Pieper*, 411 N.W.2d 225, 228 (Minn. Ct. App. 1987) ("A superseding, intervening cause of harm acts as a limitation on a defendant's liability for his negligent conduct. It breaks the chain of causation set in operation by a defendant's negligence, thereby insulating his negligence as a direct cause of the injury."). Further, because Minnesota is a comparative fault state, Sanimax will be able to avoid liability for all of the odors that it did not cause. *See* Minn. Stat. 604.01 ("…any damages allowed must be diminished in proportion to the amount of fault attributable to the person recovering").

In sum, Plaintiffs' likelihood of recovering under any of their claims is questionable at best. Weighed against this reality, the "single most important factor in determining whether a settlement is fair, reasonable, and adequate" strongly indicates that the proposed Settlement Agreement ought to be approved. *See Marshall*, 787 F.3d at 508.

## IV.  THE LESS THAN A HANDFUL OF OBJECTIONS HAVE NO MERIT

Other than the City of Newport ("Newport"), its mayor, Dan Lund ("Lund"), and the president of its city athletic association, Steven Bern ("Bern"), none of the thousands of putative Class Members objected to the proposed settlement. These objections lack merit and should not stand in the way of the Court's approval of the settlement.[2]

### A.  Newport

Notwithstanding the time and resources expended by the parties and the Court to address Newport's motion to intervene to obtain standing to comment on the Settlement Agreement,[3] Newport has now lodged objections to the settlement as a class member, by virtue of its ownership of residential property within a two mile radius of Sanimax's facility. Newport 4/2/2020 letter at 1. Newport's numerous objections to the proposed settlement boil down to three primary issues: (1) the amount of money designated for odor

---

[2]   To the extent Newport and/or Lund have incorporated Newport's objections to preliminary approval of the Settlement Agreement, Sanimax incorporates its responses made during the October 4, 2019 hearing and in its subsequent filings pertaining to Newport's attempted intervention.

[3]   As the Court will recall, Newport sought to intervene and object in this lawsuit long after the action had been commenced and after a settlement between the parties had been reached. At the preliminary approval hearing, Class Counsel pointed out that Newport was not a putative Class Member because it was a municipality, not a residential property owner or occupier, and thus, had no standing. Nonetheless, Sanimax suggested that the Court create a subclass of municipalities to afford Newport standing to raise its concerns so that they could be resolved as part of this lawsuit. Class Counsel opposed Sanimax's suggestion, and the Court allowed Newport to move to intervene in the case. *See* Doc 69, Sanimax 10/8/2019 letter. Newport eventually filed its Motion to Intervene (Doc 71), and after full briefing, the Court ultimately denied Newport's motion (Doc 82). Consequently, it appeared Newport would not have standing to participate in this case and would need to raise its concerns with Sanimax outside of this litigation.

mitigation; (2) the timeline for improvements; and (3) the appointment of a special master to oversee odor abatement spending.[4]

*First*, with regard to odor mitigation, Newport asserts that the $450,000 in capital improvements called for by the settlement is not enough to mitigate odors, purportedly because Sanimax has already spent $2.2 million in odor mitigation efforts with "no noticeable effect or impact on the intensity of those odors." Newport Objection ("Newport") at 2. To support this assertion, Newport alleges that "numerous" odor complaints have been lodged against Sanimax since those improvements were made. Newport's assertions are unfounded. Sanimax is unaware of the odor-related complaints referenced by Newport. Sanimax takes all odor complaints seriously; had Sanimax received any such complaints, it would have investigated the issue and, if permitted, contacted the complainant in an effort to address concerns. It is ironic, to say the least, that Newport asserts "Sanimax has been unresponsive to numerous complaints," when, to date, Newport has never disclosed these alleged "numerous" complaints, and certainly not in a timely manner that would afford Sanimax an opportunity to investigate any of them to be

---

[4] Newport's conduct necessarily causes Sanimax to question its motives. Despite Newport's inflammatory accusations, Sanimax offered to create a subclass so that Newport could properly raise its concerns in this litigation and expressly invited and "welcome[d] dialogue and genuine, good faith discussion [with Newport] about how [Sanimax] can continue to perform its vital societal function." *See* Doc 69, Sanimax letter at 1; Doc 75, Sanimax Intervention Response at 1-3. Instead, the only times Newport has communicated with Sanimax about odor issues are the two times Newport has publically lodged unsubstantiated accusations objecting to the settlement. It has never privately or otherwise contacted Sanimax to see what could be done or how the entities could work together. Newport's actions suggest it is not genuinely interested in working with Sanimax to find a workable solution.

3506444.0002/159370245.1

able to substantively respond. Contrary to Newport's assertions, Sanimax's prior efforts have made a difference, and anecdotal evidence from certain putative Class Members suggests that the odors are not nearly as bad as Newport claims. *Supra* at 5, 9-10.

More fundamentally, any such complaints do not demonstrate that Sanimax's additional investment in odor abatement equipment under the settlement will be ineffective. Of course, it is virtually impossible to eliminate all odors and still perform the vital societal function Sanimax preforms (just as it is virtually impossible to eliminate all odors from the other odor sources in the historic stockyard district). However, the investment is targeted at what would most likely be generating any odors emitted from the Facility. *Supra* at 7-8. Newport simply cannot demonstrate that Sanimax's odor abatement investments are unlikely to be successful.

*Second*, Newport objects that the four-year timeline for Sanimax to implement its odor abatement improvements is too long, and insists the work can be completed within a year. Newport at 2-3. Newport's desired timeline defies reality. Each of the likely required steps in the construction process—baseline air modeling, engineering and design, projected air modeling, permitting, bidding, construction, testing, and implementation—takes time and coordination among several third parties (including regulatory agencies), and is subject to factors that are out of Sanimax's control. *Supra* at 7-8. Construction work is subject to inevitable delays due to unforeseen circumstances, including everything from the availability of parts to the weather. Further, the COVID-19 pandemic has compounded these issues and may affect construction, permitting and other necessary timelines in ways that cannot currently be anticipated. To the extent permit amendments are required by the

improvements, regulatory timelines are uncertain and out of Sanimax's control. While Sanimax is committed under the Settlement Agreement to accomplishing this work as soon as practicable, Sanimax cannot be held responsible for such third-party delays. In short, the Implementation Period capped at four-years in the Settlement Agreement represents a reasonable and realistic timeline that accounts for inevitable delays and uncertainties, (save for the current pandemic, which was unforeseen by the parties).

Newport summarily asserts that Sanimax has incentives to delay construction, and that Sanimax should not be allowed to spend the $450,000 in "any way [it] wishes." Newport at 2. To the contrary, upon approval of the settlement agreement, Sanimax will have every incentive to complete the work in a timely fashion, since the failure to adhere to its contractual obligations under the Settlement Agreement could constitute a breach. Sanimax has agreed to annual reporting obligations to Plaintiffs' counsel, who has already demonstrated their willingness to sue Sanimax. Sanimax also has economic incentives to complete the work in a timely manner and to have as many odors abated as it can before expiration of the Implementation Period to avoid future litigation. Further, neither the Court nor counsel (nor a special master) should be in a position to control the expenditure of settlement dollars or otherwise dictate the odor abatement work. That is best left to the design and construction experts, along with the necessary regulatory oversight required to implement the odor abatement improvements. These efforts should be completed before mandating any specific project. *Supra* at 8.

*Third*, Newport argues that a special master should be appointed to oversee odor mitigation spending with "full authority" to "approve or disapprove any mitigation

undertaken by Sanimax." Newport at 3. Newport makes no effort to explain how the appointment of a special master in these circumstances would satisfy Federal Rule 53. Nor could it. Under Federal Rule 53(a)(1), a court may appoint a master only to:

> (A) perform duties consented to by the parties;
>
> (B) hold trial proceedings and make or recommend findings of fact on issues to be decided without a jury if appointment is warranted by:
>
>> (i) some exceptional condition; or
>>
>> (ii) the need to perform an accounting or resolve a difficult computation of damages; or
>
> (C) address pretrial and posttrial matters that cannot be effectively and timely addressed by an available district judge or magistrate judge of the district.

Fed. R. Civ. P. 53(a)(1). Special masters are "rarely appointed" and should be employed "only when the unique complexities of the case or the court's docket so require." *Leventhal v. Tomford*, 2018 WL 5344231 (D. Minn. Oct. 29, 2018) (citing Advisory Committee Notes to the 2003 Amendment of Fed. R. Civ. P. 53).

None of the factors authorizing the Court to appoint a special master is present here. The parties have not consented to a special master; there are no "trial proceedings" to be conducted or "findings of fact" to be made at this stage of the case; and there are no post-trial matters that could not be effectively and timely handled by the Court. Following approval of the settlement agreement, Sanimax will be bound to perform its contractual obligations, including the requirement to install odor abatement equipment consistent with the terms of the settlement agreement. There is no reason to believe the parties will not perform, and no need for the involvement of the Court, much less a special master, to

oversee the parties' performance of these contractual obligations. The settlement agreement provides the necessary remedies in the unlikely event of non-performance by either party.

Under Federal Rule 53(a)(3), the Court must also consider the fairness of imposing the likely expenses on the parties and must protect against unreasonable expense or delay when appointing a master. Fed. R. Civ. P. 53(a)(3). The appointment of a special master would cause unreasonable and unnecessary expense to the parties. The Settlement Agreement is the result of hard-fought negotiations and concessions by the parties; imposing additional expense to fund a special master would upset the deal reached by the parties, and, in the case of Plaintiffs, would effectively divert settlement dollars to additional litigation costs. In short, there is no legal basis or practical reason to appoint a special master under the circumstances.

*Finally*, Newport should not be allowed to have its cake and eat it too—meaning Newport cannot affirmatively elect to be a Member of the Settlement Class and be afforded the opportunity to raise its claims and complaints about the Settlement Agreement, while at the same time refusing to be bound by the Settlement Agreement and "reserving" its claims so that it can reassert them later in a different (or perceived more friendly) forum just in case the Court rules against it. *See* Newport 4/2/2020 letter at 2 (attempting to limits its participation in this case to be able to reassert its same claims in another forum); *but see* Doc 69, Sanimax letter (recounting and reasserting Sanimax's objection during the preliminary approval hearing that Newport is either in this case or out of it, not both);

Doc 75, Sanimax Intervention Response at 6 n.3 (citing several cases holding that only parties that will be bound by a class settlement have standing to object to it).

If the Court approves the proposed settlement, claims by all Class Members, including Newport, within the scope of the Class Action and Settlement Agreement are extinguished. *Cooper v. Federal Reserve Bank of Richmond*, 467 U.S. 867, 874 (1984) ("There is of course no dispute that under elementary principles of prior adjudication a judgment in a properly entertained class action is binding on class members in any subsequent litigation." (citations omitted)). Newport is represented by counsel of its choice (and its mayor is a lawyer himself, who graduated near the top of his law school class). Having been made aware of the law and having elected to participate in this case and assert its claims and objections, Newport cannot un-ring that bell.

Fundamental fairness and *res judicata* will preclude Newport from subjecting Sanimax to the civil version of double jeopardy. *See id.* ("Basic principles of res judicata (merger and bar or claim preclusion) and collateral estoppel (issue preclusion) apply. A judgment in favor of the plaintiff class extinguishes their claim, which merges into the judgment granting relief. A judgment in favor of the defendant extinguishes the claim, barring a subsequent action on that claim."); *see also Taylor v. Shurgell*, 553 U.S. 880, 892 (2008) (citing *Montana v. United States*, 440 U.S. 147, 153–154 (1979)).

## B. Lund

Lund is the mayor of Newport. Lund's objections largely mirror Newport's, including objections relating to the amount and efficacy of the capital improvements required under the settlement agreement, the construction timeline, and the appointment of

a special master to oversee Sanimax's odor abatement improvements. Lund Objection ("Lund") at 2-4. Sanimax incorporates its responses above in response to Lund's objections. Lund advances certain additional arguments in opposition to the Settlement Agreement to which a separate response is required.

Lund accuses Sanimax of having a "long history of failed promises" regarding odor abatement, referencing a 2010 PUD for a poultry processing facility requiring increased scrubber stack heights and a 2013 PUD for a bio-digestion facility also purportedly requiring increased stack heights. Lund at 2-3.[5] Even if these prior proceedings had any relevance to the fairness, reasonableness, or adequacy of the settlement agreement—and they do not—Lund's assertions have no merit. The stack heights on the feathers and blood plants were, in fact, appropriately increased, and the poultry plant was constructed with appropriate stack heights in 2011. Next, Lund's reference to the 2013 PUD is to a draft of it. The final version of the PUD deleted any requirement to increase stack heights because it was show that had already been done. Further, Sanimax never constructed the bio-digestion plant at the Facility.

While Sanimax and South St. Paul have not always seen eye to eye, Sanimax has always attempted to treat that city with the respect it deserves and to work as cooperatively as possible with it. There are no "failed promises," much less a "long history" of them. Sanimax has adhered to its prior commitments, and objects to Lund's purposeful or

---

[5] Lund also falsely accuses Sanimax of being litigious because it once stood up for its rights and challenged an ordinance as robbing it of its constitutional rights, which lawsuit resulted in the City agreeing to change the ordinance. *See Sanimax USA, Inc. v. City of South St. Paul*, No. 0:17-CV-00536 (D. Minn. 2017).

inadvertent misrepresentation of the facts to try to cast Sanimax in a negative light for apparent political gain. *Supra* at 22 n.4. Sanimax has been and will continue to be a good corporate citizen, and there is nothing in the record suggesting otherwise.

Lund also asserts that the value of the proposed settlement "pales in comparison to the past and ongoing damages." Lund at 2. That unsupported statement is simply not true. The ability of Plaintiffs or the Class to prove that any single odor came from Sanimax as opposed to one of the numerous other already-identified odor sources is highly questionable. In reality, Sanimax simply is not responsible for all odors in the historic stockyard district. One study[6] suggests that Sanimax could be *only partially* responsible for *only half* of the observed odors. When determining whether to approve a settlement, the Court must compare the settlement to the likely recovery of the putative class taking into consideration the merits of their claims and the risks involved with litigation, ***not*** all of the damages the putative class allegedly suffered.

Here, the settlement value of the case cannot ignore that it is highly unlikely that a putative class could be certified as the Court has already recognized. Doc 40, Order Denying Motion to Strike at 5. Nor can the Court accept Lund's invitation to turn a blind eye to the extreme proof problems in Plaintiffs' claims. Moreover, several Class Members that believe the value Sanimax and other corporate citizens in the area provides in terms of jobs, tax revenue, and the like far outweigh any possible damage. *Supra* at 9-10.

---

[6]   If Newport has ever done an odor study, it has not disclosed it. The only odor studies in the record were conducted by South St. Paul or by various companies in conjunction with working with South St. Paul.

3506444.0002/159370245.1

Next, Lund asserts that "judicial expediency" requires that the Settlement Agreement provide "actual mitigation" of nuisance odors. Lund at 4. Judicial expediency is not among the factors considered by the Eighth Circuit or the Federal Rules of Civil Procedure in determining whether to approve the settlement. *See Fath v. American Honda Motor Co., Inc.*, 2019 WL 6799796, at *2 (D. Minn. Dec. 13, 2019) (reciting various factors considered by the courts). Even if it was, the four-year implementation period best serves the interests of judicial expediency and economy. Absent a settlement, this litigation could last for several years through appeal, and require the expenditure of substantial resources of the parties and the Court. Any available dollars for payments to any putative Class Members or for odor abatement would quickly be eaten up in litigation fees and costs.

Moreover, providing some type of unspecified, rigid mitigation targets in the settlement agreement would eliminate the needed flexibility to best manage odor issues, and would ultimately require more, not less, judicial involvement. The Settlement Agreement appropriately accounts for the reality that numerous, complex factors beyond anyone's control can impact odor emissions on any given day. *Supra* at 7-8.

Finally, Lund requests that the settlement agreement be amended by the Court to provide for liquidated damages in the event of non-compliance. Forcing the parties to accept a liquidated damages provision is both unnecessary and improper. As discussed above, the parties already have sufficient incentives to abide by their contractual obligations under the terms of the Settlement Agreement. Moreover, a liquidated damages provision goes far beyond the deal struck by the parties, and the Court lacks the authority to substantively re-write the settlement agreement. *Rilley v. MoneyMutual, LLC*, 2020 WL

1872923, at *2 (D. Minn. April 14, 2020) (citing *Rawa v. Monsanto Co.*, 934 F.3d 862, 871 (8th Cir. 2019) ("[T]he power to approve or reject a settlement negotiated by the parties before trial does not authorize the court to require the parties to accept a settlement to which they have not agreed.")).

### C.    Bern

Bern is also from Newport and is president of the Newport Athletic Association, which has the same address Newport City Hall. Bern raises four objections to the settlement. Bern Objection ("Bern") at 1-2. Bern's second and third objections relate to the amount and timing of the odor abatement improvements, which are addressed above.

Bern also takes issue with the recitals of non-liability in the Settlement Agreement. Bern at 1. As the Court is aware, assertions of non-liability in a settlement agreement are frequently a necessary condition to facilitate resolution. Moreover, if the Court approves the proposed settlement, Sanimax will be contractually bound to undertake odor mitigation efforts under the Settlement Agreement. If the Court does not approve the proposed settlement, Sanimax intends to defeat class certification and then challenge and defeat Plaintiffs' attempts to prove that Sanimax is liable under Minnesota law. With all due respect to Bern, any recital that substantively differs from what is in the Settlement Agreement would not be a true statement.

Finally, Bern objects that the annual progress updates required under Section 6(c) should be more detailed and should be provided to the Court and the "mayors of affected cities for publication and dissemination." Bern at 2. Neither this lawsuit nor the settlement is or should become a political process. Perhaps in agreement, the City of South St. Paul

31

has opted out of this case, and its mayor has adopted no public or political role with respect to it. Newport and its mayor have taken a different approach, deciding not to work or even attempt to work cooperatively with Sanimax, but instead to publically cast baseless accusations at it. As noted above, Newport's conduct justifiably gives Sanimax reason to question its true motives. *Supra* at 22 n.4. Sanimax has already agreed to a reporting mechanism as part of the Settlement Agreement, making it subject to Class Counsel who has already demonstrated their willingness to sue Sanimax if they believe the circumstances warrant. That concession by Sanimax ought to be more than enough.

## CONCLUSION

For almost six decades, Sanimax has performed an essential function in the heart of the historic stockyard district of South St. Paul and Newport, converting agricultural waste products into a host of useful household and commercial products. As even members of the putative Settlement Class have acknowledged, the social utility of Sanimax's rendering operations, including substantial economic and environmental benefits, far outweighs the occasional odors that may come from Sanimax and other industries in an area long known for its industrial heritage.

While Plaintiffs may prefer not to be inconvenienced with intermittent odors from these sources, the nuisance and negligence claims they have attempted to advance against Sanimax in this lawsuit are factually, procedurally, and substantively flawed. Under both Minnesota law and the Rule 23 standard for class certification, a substantial risk exists that a class will not be certified and that Plaintiffs will recover nothing should this action proceed to discovery and a trial.

3506444.0002/159370245.1

At the same time, the proposed Settlement Agreement provides genuine benefits to the putative Settlement Class and the community, including monetary compensation and additional odor mitigation through Sanimax's capital improvements. The benefits the proposed settlement will provide today greatly outweigh the potential recovery (or non-recovery) years from now. Plaintiffs and Sanimax each have independently determined that the Settlement Agreement is in the best interests of all the parties. In light of all the relevant considerations, the proposed Settlement Agreement is more than a fair, reasonable, and adequate resolution to this litigation. Sanimax respectfully requests that the Court approve it.

Respectfully submitted,

**STINSON LLP**

Dated: May 11, 2020

Andrew W. Davis (#0386634)
50 South Sixth Street, Suite 2600
Minneapolis, MN 55402
Telephone: (612) 335-1500
E-mail: andrew.davis@stinson.com

s/ Matthew J. Salzman
Matthew J. Salzman (admitted *pro hac vice*)
1201 Walnut, Suite 2900
Kansas City, MO 64106
Telephone: (816) 842-8600
E-mail: matt.salzman@stinson.com

***ATTORNEYS FOR DEFENDANT***
***SANIMAX USA, LLC***